**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION**

| | |
|---|---|
| JOANN M. GORCESKY, ) | Civil Action No.: |
| ) | |
| Plaintiff, ) | |
| ) | **COMPLAINT** |
| vs. ) | **Violation of the FMLA;** |
| ) | **the ADA/ADAAA;** |
| HHC SOUTH CAROLINA, INC., d/b/a ) | **and the ADEA** |
| LIGHTHOUSE BEHAVIORAL HEALTH ) | |
| HOSPITAL, UNIVERSAL HEALTH ) | |
| SERVICES, INC. and ) | **JURY TRIAL DEMANDED** |
| UHS OF DELAWARE, INC., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

The plaintiff, complaining of the acts of the defendants, alleges as follows:

**PARTIES AND JURISDICTION**

1. That plaintiff is a resident and citizen of the County of Horry, State of South Carolina.

2. That, upon information and belief, the defendant HHC South Carolina, Inc. d/b/a Lighthouse Behavioral Health Hospital ("defendant" or "LBHH") is a South Carolina corporation doing business and maintaining offices and agents in the Counties of Horry and Charleston in the State of South Carolina and is in the business of providing psychiatric medical services to the public. Upon information and belief, said defendant employed plaintiff.

3. That, upon information and belief, the defendants Universal Health Services, Inc. ("defendant" or "UHSI") and UHS of Delaware, Inc. ("defendant" or "UHSD") are foreign corporations with either both or one of said defendants having a management contract with defendant LBHH to manage LBHH and, upon information and belief, defendant UHSI and

1

UHSD have an ownership interest and/or control over defendant LBHH (and its employees) and also employed plaintiff and/or controlled plaintiff's employment. Both defendants do business and maintain offices and agents in the Counties of Horry and Charleston in the State of South Carolina.

4. That this court has federal question jurisdiction of the above-styled action pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"); the ADA Amendments Act of 2008 ("ADAAA" and collectively referred to as the "ADA"); 42 U.S.C. § 12203 ("ADA retaliation"); the Family Medical Leave Act of 1993, 29 U.S.C. §§ 2601-2654 ("FMLA"); the Age Discrimination in Employment Act, 29 U.S.C. § 623, et seq. ("ADEA"); and 28 U.S.C. § 1331.

5. That venue for all causes of action stated herein lies in the district of South Carolina, Florence Division, in that, pursuant to 28 U.S.C. § 1391(b), the parties reside in the said district, and a substantial part of the events giving rise to plaintiff's claims occurred here.

## CONDITIONS PRECEDENT

6. That the plaintiff has exhausted all administrative remedies and conditions precedent (on the claims asserted by plaintiff which require exhaustion of administrative remedies, namely the ADA and ADEA), including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of the foregoing action, all of which are more fully described below. Moreover, defendants each employed over fifteen (15) and over twenty (20) employees at all relevant times as defined by the ADA and the ADEA and thus, said defendants are employers as defined by said Acts and are otherwise subject to and covered by said Acts.

7. That on or about October 31, 2019, and as a result of defendants' discriminatory conduct, all of which is more fully described below, plaintiff timely filed a

2

complaint with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based upon disability under the ADA, discrimination based on age under the ADEA, and retaliation based upon the ADA and the ADEA.

8. That on or about June 22, 2020, plaintiff received a Notice of Right to Sue from the EEOC regarding the complaint described in Paragraph 7 above.

9. That plaintiff has timely filed the foregoing action within ninety (90) days of the date on which she received the Notice of Right to Sue described above in Paragraph 8.

## FACTUAL ALLEGATIONS

10. That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 9 hereinabove as fully as if set forth verbatim.

11. That plaintiff is a 60-year old female and suffers from disabilities as a result of a workplace injury. Otherwise, plaintiff holds a Bachelor's Degree, a nursing license, and she is certified in psychiatric nursing.

12. That in or around February of 2003, defendants hired plaintiff as a Registered Nurse to treat patients with psychiatric and/or addiction issues. In or around 2009, defendants promoted plaintiff to Night Supervisor, a position responsible for the leadership and oversight during the night shift at the hospital.

13. That as a Night Supervisor, plaintiff reported to the Chief Nursing Officer ("CNO") who, by in or around 2016 was Patricia Godbold ("Godbold"). Godbold worked on site at the hospital and she reported to the CEO, Tom Ryba ("Ryba").

14. That by 2018, plaintiff was earning an annual salary of $77,000 plus yearly bonuses in the approximate amount of $3,000 and full benefits. Valuing plaintiff's benefits at 25% of gross salary ($19,250), plaintiff's yearly compensation at defendants was around $99,250.

($77,000 + $3,000 in bonuses + $19,250 in benefits).  Otherwise, plaintiff was in good health and planned to work until at least the age of 67 and, most likely longer - until the age of 72.

15. That during plaintiff's employment at defendants, she performed her job duties in an above-satisfactory fashion and maintained an acceptable work record there. Plaintiff always received above average or excellent overall ratings on her performance evaluations and, in 15 years of employment at defendants, plaintiff was only disciplined on two (2) occasions for minor issues that occurred many years ago.  In a written reference authored by Godbold after plaintiff's termination, Godbold wrote that plaintiff impressed her with her (plaintiff's) clinical knowledge, attention to detail, enthusiasm and aptitude in her job.

16. That as a Night Supervisor plaintiff's job was not physically strenuous, and not nearly as physically demanding as the job of a Registered Nurse or Orderly.  Almost all of plaintiff's general duties involved preparing paperwork and talking to others in person or on the phone and, specifically included, but were not limited to:  supervising her staff, setting and preparing schedules for her staff, handling admission calls for new patients, preparing summaries, trouble shooting, and occasionally, when needed, filling in for a nurse.

17. That on or about May 1, 2018, plaintiff injured her right shoulder at work when a large psychotic patient became agitated and pushed plaintiff into a door.  At the time of plaintiff's injury, the hospital was short staffed with only one (1) male employee in the building on the night shift.  Otherwise, as a Night Supervisor, plaintiff typically did not deal with or restrain such patients and this task was not one of plaintiff's job duties, let alone an essential duty.

18. That the following morning plaintiff went to Doctor's Care where she was x-rayed, placed on light duty with restrictions, and put on a regime of physical therapy.

19. That after her injury plaintiff could still walk, move, type, write, use the computer, talk on the phone and/or in person, and otherwise perform all of the duties of her job without the need for any meaningful accommodation – at least in respect to plaintiff's essential duties.

20. That after plaintiff's injury Godbold and Ryba had plaintiff immediately return to her Night Supervisor position, with the only restriction being that plaintiff could not assist in any circumstance or emergency involving a physically agitated or threatening patient. To be clear, assisting in such an emergency was a rare occurrence; it was not a duty of plaintiff's job; and if it was, it was not an essential duty of plaintiff's job.

21. That even though plaintiff could perform the essential duties of her job as described above, after several weeks plaintiff was still experiencing pain and range of motion issues with her right shoulder. As a result, plaintiff was referred to Todd Tupis, M.D., ABOS at Coastal Orthopedics for further assessment and treatment. After two (2) MRI's, plaintiff was ultimately diagnosed with adhesive capsulitis, a painful condition sometimes referred to as "frozen shoulder," which occurs when the strong connective tissue surrounding the shoulder joint becomes thick, stiff and inflamed, and a condition that can last over ten (10) years for some patients.

22. That Dr. Tupis initially treated the condition with Cortisone shots and continued physical therapy. In the meantime, he kept plaintiff on "light duty" with restrictions, but plaintiff could, and did, continue to perform the full duties of her Night Supervisor job. Despite the above treatment, plaintiff's condition did not improve, and she continued to experience pain and range of motion issues in her shoulder.

23. That as such, sometime in or around September of 2018 Dr. Tupis recommended that plaintiff have surgery on her right shoulder. The surgery was scheduled for Tuesday, September 25, 2018.

24. That thereafter, plaintiff spoke to Godbold and requested medical leave to have the surgery. In doing so, plaintiff engaged in protected activity under the ADA and FMLA in that she requested FMLA leave and a reasonable accommodation under the ADA in the form of short-term medical leave to deal with her disability, namely her shoulder. Defendants, through Godbold, granted plaintiff's request for medical leave. In doing so, Godbold never brought up the FMLA or ADA or otherwise explained to plaintiff her rights under these laws; she never provided plaintiff with FMLA or ADA accommodation paperwork, despite the fact that plaintiff's health condition and related absences were clearly covered by the FMLA as well as the ADA; and, prior to going out on medical leave (and during plaintiff's leave), no one at defendants designated plaintiff's medical leave as FMLA or ADA accommodation leave.

25. That on or about Thursday, September 20, 2018, plaintiff went out on medical leave to have her September 25, 2018 surgery. By the time plaintiff did so, she had fully performed her job as a Night Supervisor (on "light duty" with "restrictions") for over 4½ months (from on or about May 1, 2018 to on or about September 20, 2018), all in a competent fashion without incident or issues and without the need for an accommodation (except for limited short-term medical leave). During this 4½ month period, there were no emergencies relating to a physically threatening patient that would have somehow required plaintiff's intervention or assistance.

26. That on or about September 25, 2018, plaintiff had surgery as planned. Thereafter, during the months of October, November and December of 2018, plaintiff recovered from surgery by continuing to visit Dr. Tupis and by continuing her physical therapy regime.

27. That also during this time, Chad Hutchinson ("Hutchinson"), defendants' Director of Human Resources, communicated with plaintiff for updates. In doing so, at no time did he bring up the FMLA or ADA or otherwise designate plaintiff's leave as FMLA or ADA accommodation leave. Moreover, he never advised plaintiff that her job or her employment with defendants was in jeopardy due to her injury or medical leave.

28. That sometime in or around December of 2018, Dr. Tupis advised plaintiff that she could return to work on Wednesday, January 2, 2019, still on light duty with restrictions on the use of her right shoulder.

29. That plaintiff immediately passed this information on to defendants.

30. That by the end of December 2018, after surgery and three (3) months of recovery, plaintiff was in about the same physical condition she was in prior to her medical leave and surgery. Plaintiff was still experiencing pain and range of motion issues with her right shoulder but, as was the case pre-surgery, plaintiff could still easily perform all of the essential functions of her Night Supervisor position, without accommodation. Plaintiff did not have a cast, brace, or anything else that would restrict or impede her ability to perform her Night Supervisor job. The only possible restriction was that plaintiff probably needed to stay away from physically agitated patients, but this was not an essential duty of plaintiff's job that would even require an accommodation.

31. That despite the above, in or around the end of December 2018, about a week before plaintiff's return to work date, Godbold called plaintiff and stated that she (and the defendants) were concerned for plaintiff's safety and that, when plaintiff returned to work, they

wanted her to temporarily work the day shift, in a documentation-type job, performing menial tasks, until plaintiff's physician released her from light duty. Godbold stressed that the arrangement was just a temporary one and assured plaintiff repeatedly that, when her restrictions were lifted, plaintiff would immediately go back to her Night Supervisor position. Otherwise, Godbold did not bring up pay rate, so plaintiff just assumed her pay would stay the same.

32. That at the same time, defendants' concern for plaintiff's safety was unfounded and false, as plaintiff could fully perform the Night Supervisor job (just like she did before her medical leave and surgery), and plaintiff advised Godbold of such. Moreover, defendants did not express the same concern for plaintiff's safety during the 4½ months when plaintiff was working in the same position before her surgery. At the same time, defendants did not engage plaintiff in any meaningful dialogue about her disability, plaintiff's restrictions, or potential accommodations that would allow plaintiff to perform the job. Nevertheless, plaintiff understood Godbold's conversation as a directive or order and, in reliance on defendants' repeated assurances that the change in positions was only temporary and that her pay would not change, plaintiff agreed to work the other job – on a temporary basis.

33. That on or about January 2, 2019, plaintiff reported to work on the day shift as directed. There, plaintiff was placed into a Nursing Treatment Team and Documentation Coordinator position ("Nursing Coordinator") earning the same salary she earned as Night Supervisor, but without the bonuses.

34. That the Nursing Coordinator job was not a supervisory job in any shape or form. As Nursing Coordinator, plaintiff did not supervise anyone, and she did not perform any supervisory duties (as plaintiff had in her Night Supervisor position). Instead, in plaintiff's new job, plaintiff performed mostly menial, sedentary, documentation duties like preparing and

8

formulating patient treatment plans and auditing patient charts. The Nursing Coordinator job was significantly less prestigious than the Night Supervisor position.

35. That at some point on or about January 2, 2019, Godbold again reassured plaintiff that plaintiff's Nursing Coordinator job was only temporary until plaintiff was taken off light duty at which time plaintiff would again be placed back into her Night Supervisor position. Godbold further volunteered to plaintiff that, when plaintiff went back to her Night Supervisor job, Robin Bonds ("Bonds") would then be placed in the Nursing Coordinator position, as Bonds was having babysitter issues and needed to work on the day shift. Cheryl Rosenberg ("Rosenberg"), a Nurse Manager at defendants, was present when Godbold made the above remarks. Otherwise, Bonds is a 45-year old female nurse that reported to plaintiff on the night shift. She would also act as Night Supervisor on the weekends and on plaintiff's days off. To plaintiff's knowledge, Bonds does not suffer from a known disability; she has not requested ADA accommodations while employed at defendants; and she has not used significant FMLA leave there.

36. That in response to Godbold's statements on or about January 2, 2019, plaintiff responded that she was fully able to perform the duties of her Night Supervisor job and that she wanted to return to that position immediately. Otherwise, when plaintiff returned to work, no one at defendants spoke to plaintiff about the FMLA or ADA or entered into any type of dialogue with plaintiff about whether she could perform the essential duties of her Night Supervisor job or, if not, then whether any reasonable accommodations existed that would allow plaintiff to do so. Instead, plaintiff was just herded into the Nurse Coordinator job working day shift without discussion or dialogue. But, as stated above, plaintiff accepted the situation for the time being, and duly performed the duties of her new "temporary" position.

9

37. That on or about January 29, 2019, plaintiff was called to meet with Godbold and Hutchison in an office in the Human Resource Department.  At the meeting, plaintiff was advised that her annual pay was being reduced by $30,000, from $77,000 to $47,000, effective immediately.  In response, plaintiff advised Godbold and Hutchinson that, in that case, she was ready, willing and able to return to her Night Supervisor job at full pay and that she was physically able to do so immediately.

38. That Godbold then advised plaintiff that her Night Supervisor job was no longer available; that it had been given to Robin Bonds; and that plaintiff was not going back to her Night Supervisor job – even after she came off light duty as promised.  Godbold further volunteered that she and the defendants were still concerned for plaintiff's safety and they felt plaintiff should remain in the Nursing Coordinator job.  Even though plaintiff became visibly upset, Hutchinson remarked that the defendants did not have to hold plaintiff's job as Night Supervisor open for her, because plaintiff's FMLA had expired, whatever that meant.  Plaintiff replied by complaining that she did not even know she was out on FMLA leave at the time; that defendants never told plaintiff she was on FMLA leave; that they never designated her leave as such – even though plaintiff's absences were covered by the FMLA; and that defendants never provided her with any FMLA forms or paperwork and refused to assist her in taking medical leave.  In fact, defendants never trained plaintiff on the FMLA, ADA or ADEA. In all events, plaintiff's remarks on this occasion constitute protected activity under the FMLA,  ADA and ADEA.

39. That out of exasperation, plaintiff then asked if she could go back to being a Staff Registered Nurse on the night shift.  Hutchinson and Godbold responded that plaintiff would have to have a physical at Doctor's Care and then apply for the position – if one was

10

even available.  Godbold again stated falsely that plaintiff would be placing herself at risk if she did apply for such a position.

40. That at the end of the meeting plaintiff hesitantly and under protest agreed to stay in the temporary Nursing Coordinator position, earning $25 an hour, with the understanding she could apply to stay in the position (at the reduced salary) once she was released from light duty, because plaintiff simply did not know what else to do.

41. That the next day, January 30, 2019, defendants had plaintiff sign a memo stating, among other things, that since defendants made the Nursing Coordinator position permanent, they were required to adjust (and lower) the pay for the position to "better align its pay scale to the position requirements."  It also confirmed that, effective January 28, 2019, plaintiff's hourly rate would be reduced to $25 an hour in the Nursing Coordinator position and that, once plaintiff was released without restrictions, the position would open up as a permanent, full-time position "of which [plaintiff] would then be required to apply for as an internal candidate."

42. That by this time it was clear that management at defendants wanted to get rid of plaintiff because of her disabilities, her FMLA and ADA activity, including her requests for FMLA/ADA leave, and her age.  Indeed, when Rosenberg found out that defendants had reduced plaintiff's pay, she told plaintiff to "hire a lawyer."

43. That then, on or about May 17, 2019 in the middle of the day, Hutchinson called plaintiff to the office and fired her, telling plaintiff the Nurse Coordinator job plaintiff had been performing was no longer available.  A witness, Holly Kemble, was also present. Hutchinson then asked plaintiff for her keys and badge and, thereafter, Ms. Kemble escorted plaintiff to retrieve her pocketbook from the cabinet and then escorted plaintiff out the front door in full view of all those in the facility.

44. That approximately two (2) hours later, Godbold called plaintiff and told plaintiff that she was sorry; that she did not agree with what they (the defendants) did; that she refused to be a part of it; and that she told the defendants she wanted no part of it. Later, Godbold sent plaintiff a text message stating "I am so sorry this happened. Please know I appreciate all you did for our organization, patients and staff." On or about June 3, 2019, Godbold prepared a glowing reference letter for plaintiff.

### FOR A FIRST CAUSE OF ACTION:
### VIOLATION OF THE FMLA
### (29 U.S.C. §§ 2601-2654)
### (RETALIATION)

45. That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 44 hereinabove as fully as if set forth verbatim.

46. That pursuant to the FMLA, plaintiff had been employed with defendants for over 12 months, had provided over 1,250 hours of service to defendants during the 12 months prior to her leave, and was otherwise employed at a work site where 50 or more employees are employed by defendants within 75 miles of the work site.

47. That defendants are engaged in commerce and/or an industry or activity affecting commerce, and each defendant employs 50 or more employees each working day during each of 20 or more work weeks in the current or preceding calendar year.

48. That as such, plaintiff is a covered employee and defendants are covered employers under the FMLA.

49. That plaintiff was suffering from a serious health condition as defined by the FMLA - namely, plaintiff suffers from adhesive capsulitis as described above, all of which caused plaintiff to be incapacitated for more than three (3) consecutive days and/or hospitalized overnight, and caused plaintiff to visit several physicians on multiple occasions, all

12

of which prescribed medication to plaintiff. Moreover the condition is chronic and long term.

50. That as alleged, plaintiff performed her job duties at defendants in an above-satisfactory fashion and to defendants' reasonable and legitimate expectations.

51. That plaintiff engaged in protected activity under the FMLA on or about September 20, 2018, September 25, 2018, the end of December 2018, January 2, 2019 and January 29, 2019 by requesting and taking FMLA leave, and/or by requesting and taking medical leave that should have been covered by the FMLA, and/or by objecting to her demotion and pay cut and by otherwise objecting to or opposing discrimination prohibited by the FMLA. At the same time, defendants never advised plaintiff about the FMLA or plaintiff's rights under the FMLA; they never trained plaintiff on the FMLA or advised her on how to request leave under the Act; they never provided plaintiff with any FMLA forms or paperwork to fill out; and, they never designated plaintiff's leave as FMLA leave.

52. That shortly after plaintiff exercised her rights under the FMLA (and engaged in protected activity under said Act) defendants abruptly removed plaintiff from her job, demoted plaintiff into a less-prestigious job, cut plaintiff's pay by $30,000, and fired plaintiff.

53. That defendants violated the FMLA by engaging in the following adverse actions against plaintiff: they abruptly removed and demoted plaintiff into a less-prestigious job with no supervisory duties, and a job that had plaintiff working a different, less-desirable shift, performing menial job duties; they cut plaintiff's pay by $30,000; and they fired plaintiff, all of which have been done without warning, notice, or cause and for false reasons or reasons not worthy of credence, all because:

(a) Plaintiff exercised her rights under the FMLA by requesting and taking FMLA leave or leave that should have been covered by the FMLA;

13

      (b)    Plaintiff missed a significant amount of time from work by taking leave that was, or should have been, covered by the FMLA; and/or

      (c)    Independent of (a) and (b) above, defendants failed and refused to restore plaintiff into the position she held at the time her leave commenced, or to an equivalent position, despite the fact that plaintiff could perform the duties of her job and did so for 4½ months leading up to her surgery.

54. That as a result of the defendants' actions as set forth above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, economic injury, attorney's fees and costs, and prejudgment interest.

55. That defendants' actions, as set forth above, were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover liquidated damages from defendants.

### FOR A SECOND CAUSE OF ACTION: VIOLATION OF THE ADA/ADAAA (42 U.S.C. § 12101, et seq.)

56. That plaintiff hereby repeats and realleges each and every allegation in Paragraphs 1 through 55 hereinabove as fully as if set forth verbatim.

57. That as alleged above, at all pertinent times each defendant employed fifteen (15) or more employees at all relevant times as defined by the ADA and, thus, the defendants are each "employers" as defined by the ADA and otherwise subject to said Act.

58. That as a result of plaintiff's conditions and impairments as set forth above, specifically plaintiff's adhesion capsulitis, plaintiff is substantially limited in one or more major life activity (as compared to most people in the general population) namely the activities of bending, stooping, climbing, standing, lifting, pushing, pulling, reaching, moving and working.

14

59. That despite the above, plaintiff could perform the essential functions of her job at defendants without accommodation (or with minor accommodation in the form of short-term medical leave of a limited duration). Otherwise, prior to taking her FMLA/ADA leave, and at the time of her termination, plaintiff was performing her job at defendants in a manner that met defendants' legitimate and reasonable expectations.

60. That as such, the plaintiff is disabled as defined by the ADA. Moreover, defendants regarded and/or perceived plaintiff as being disabled as defined by the ADA.

61. That defendants violated the ADA in the following manners:

    (a) By failing and refusing to enter into dialogue with plaintiff about her disability, her ability to perform the essential duties of the Night Supervisor job, her restrictions, and potential accommodations for said job;

    (b) By failing and refusing to accommodate plaintiff ;

    (c) By failing and refusing to place plaintiff back into her Night Supervisor position (the position plaintiff held before going out on medical leave and having surgery), all on account of plaintiff's disability and/or perceived disability;

    (d) By demoting plaintiff into the Nursing Coordinator position, a less-prestigious, non-supervisory job that had plaintiff working a different shift and performing menial job duties, all on account of plaintiff's disability and/or perceived disability;

    (e) By substantially reducing plaintiff's pay by over $30,000, all on account of plaintiff's disability and/or perceived disability;

    (f) By terminating plaintiff because of her disability and/or perceived disability and/or because of the absences related to plaintiff's disability or perceived disability; and

    (g) By retaliating against plaintiff by refusing to place plaintiff back into her Night Supervisor job, by demoting plaintiff, by substantially reducing plaintiff's pay by $30,000, and by firing plaintiff, all because plaintiff engaged in protected activity under the ADA by requesting and using a

15

>  reasonable accommodations in the form of short-term medical leave of a limited duration to have her surgery and recover.

62. That as a result of defendants' actions as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, pain and suffering, loss of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment, humiliation, loss of professional standing, character and reputation, and physical and personal injuries and sickness. Plaintiff has also incurred and seeks her attorney's fees and costs and prejudgment interest.

63. That the defendants' actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendants.

### FOR A THIRD CAUSE OF ACTION: VIOLATION OF THE ADA/ADAAA (42 U.S.C. § 12203) (RETALIATION)

64. That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 63 hereinabove as fully as if set forth verbatim.

65. That as alleged above, at all pertinent times each defendant employed fifteen (15) or more employees and, thus, each defendant is an "employer" as defined by the ADA and otherwise subject to said Act.

66. That plaintiff engaged in protected activity under the ADA on or about September 20, 2018, September 25, 2018, the end of December 2018, January 2, 2019 and January 29, 2019 by requesting, obtaining and using reasonable accommodations in the form of short-

16

term medical leave of a limited duration; by complaining to management and Human Resources that defendants were violating the FMLA and ADA/ADAAA by not placing her in and/or by not returning her to the position she occupied before she engaged in protected activity - namely the Night Supervisor Job; and by otherwise opposing discrimination prohibited by the ADA/ADAAA.

67. That shortly after plaintiff engaged in the protected activity described above, defendants transferred plaintiff into a different, less-prestigious, non-supervisory job, working a different, less-desirable shift, performing menial job tasks, they cut plaintiff's pay by $30,000, and fired plaintiff, all because plaintiff engaged in the said protected activity.  As such, defendants have violated the ADA by illegally retaliating against plaintiff.

68. That as a result of defendants' actions as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, pain and suffering, loss of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment, humiliation, loss of professional standing, character and reputation, and physical and personal injuries and sickness. Plaintiff also seeks her attorney's fees and costs and prejudgment interest.

69. That the defendants' actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendants.

**FOR A FOURTH CAUSE OF ACTION:
VIOLATION OF THE ADEA
(29 U.S.C. § 630(a), et seq.)**

70. That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 69 hereinabove as fully as if set forth verbatim.

71. That each defendant is a "person" within the meaning of the ADEA, 29 U.S.C. § 630(a).

72. That defendants are in an industry that affects commerce and defendants employed twenty (20) or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar years, and thus, defendants are each employers as defined by the ADEA, 29 U.S.C. § 630(b).

73. That plaintiff is sixty (60) years old and was over forty (40) years of age at the time of defendants' discriminatory conduct as alleged herein and, therefore, plaintiff is in a protected class.

74. That at the time of plaintiff's termination and at all times prior thereto, plaintiff was performing her job at defendants in a manner that met defendants' reasonable and legitimate expectations.

75. That despite the above, defendants transferred and demoted plaintiff into a Nursing Coordinator job, a less-prestigious, non-supervisory job that had plaintiff working on a different, less-desirable shift, performing menial tasks; defendants cut plaintiff's pay by $30,000; and, defendants fired plaintiff – all without warning, notice or cause and for false reasons, all because of plaintiff's age.

76. That defendants replaced plaintiff with substantially younger employees and/or defendants assigned plaintiff's job duties to substantially younger employees after plaintiff was fired and/or plaintiff's position remained open and/or defendants fired plaintiff under circumstances which give rise to an inference of discrimination based upon age.

77. That as such, defendants have violated the ADEA by discriminating against plaintiff because of her age in the manners set forth above.

78. That as a result of the actions of the defendants, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, economic injury, and further seeks damages in the form of attorney's fees and costs and prejudgment interest.

79. That defendants' actions were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover liquidated damages from the defendants.

WHEREFORE, plaintiff prays for judgment against the defendants, jointly and severally, as follows:

(a) As to plaintiff's First Cause of Action (for violation of the FMLA) and Fourth Cause of Action (for violation of the ADEA), for such an amount of actual and special damages as the trier of fact may find (including lost back and future wages, income and benefits, expenses associated with finding other work and other economic injuries) liquidated damages, prejudgment interest, the costs and disbursements of this action, including reasonable attorney's fees, and for such other and further relief as the court deems just and proper; and

(b) As to plaintiff's Second and Third Causes of Action (for violations of the ADA/ADAAA), for such an amount of actual and special damages as the trier of fact may find (including lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, pain and suffering, loss of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment, humiliation, loss of professional standing, character and reputation, and physical and personal injuries and sickness), punitive damages, prejudgment interest, the costs and disbursements of this action, including reasonable attorney's fees and for such other and further relief as the court deems reasonable, just and proper.

HITCHCOCK & POTTS

By: *s/A. Christopher Potts*
Federal ID No.: 5517
31 Broad Street (P.O. Box 1113)
Charleston, SC 29401 (29402)
Telephone: (843) 577-5000
Email: hitchp@bellsouth.net
*Attorneys for the Plaintiff*

Charleston, South Carolina
September 15, 2020